**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| RICHARD CHERRY, GEORGE JAMES, and JOSEPH ROOP, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 1:03-CV-136-TS |
| AUBURN GEAR, INC. , | ) ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

After years of providing health insurance for its retirees, the Defendant, Auburn Gear, Inc., discontinued it in November 2002, in the midst of financial difficulties and rising health care costs. Plaintiffs Richard Cherry, George James, and Joseph Roop were among the retirees who lost their health insurance. Believing that they and other retirees had health insurance for life, Plaintiffs Cherry, James, and Roop filed a class action suit in this Court to get back their benefits and to recover their health care expenses. On May 11, 2004, the parties stipulated that this case should proceed as a class action, with the understanding that any suitable subclasses would be determined later, if necessary. The Court approved the stipulation, and on July 30, 2004, class members were sent notice about the lawsuit.

On November 1, 2004, the Defendant moved for summary judgment. On December 22, 2004, the Plaintiffs also moved for summary judgment on the issue of the Defendant's liability. On December 23, 2004, the Plaintiffs filed their Response to the Defendant's motion for summary

judgment, and on January 21, 2005, the Defendant filed its Reply brief in support of its motion for summary judgment.

On February 28, 2005, the Court granted the Defendant's January 20, 2005, motion to strike as untimely the Plaintiffs' motion for summary judgment. On June 27, 2005, the Court entered a final order confirming class certification. Now, the Court will address the Defendant's motion for summary judgment and decide if any genuine issues of fact exist as to whether the Plaintiffs are entitled to lifetime health insurance benefits.

## THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.


### B.  Material Facts

### (1) *The Parties*

The Defendant owns a manufacturing facility in Auburn, Indiana, which it purchased from Borg-Warner in November 1982. The Plaintiffs' class consists of employees who retired from this facility, their spouses, and dependents. Some of the class members worked for Borg-Warner, some for the Defendant, and some for both.


### (2) *Borg-Warner Contracts*

The United Automobile-Aerospace-Agricultural Implement Workers Union, Local No. 825,

4

was the exclusive bargaining representative of the Auburn facility's employees. From 1971 until

1983, about every three years, Borg-Warner and the Union negotiated a new collective bargaining

agreement (CBA), along with a concurrent collective bargaining insurance agreement (CBIA) that

governed various insurance benefits for employees and retirees. During that period, Borg-Warner

and the Union had four contracts covering the following years: 1971–74, 1974–77, 1977–80, and

1980–83.[1]

All these contracts are similar to each other in their structure, wording, and benefits offered.

Each CBA has an integration clause. For example, the 1971 CBA states:

> 8.1.1.   It is understood that this Agreement, together with the following Agreements,
> shall be considered the full working arrangement between the Company and
> the Union"
> (a)      Retirement Income Agreement and Plan
> (b)      Insurance Agreement
> (c)      Supplemental Unemployment Benefit Agreement and Plan
>
> 8.2.1   Each said Agreement shall be considered a separate portion which can be
> negotiated independently. Each of these several Agreements shall continue
> in full force and effect unless notice is given to modify, amend, suspend, or
> terminate as provided in each of the said Agreements.

(Def's Ex. G, 1971–74 CBA § 8.1.1–8.1.2.) The 1974, 1977, and 1980 CBAs contain identical

language.

Each CBIA limits the duration of various health insurance benefits to the term of the

agreement. For example, the 1971 CBIA, entitled Group Insurance Agreement, states in Section 1:

> The Company will maintain during the period of this Agreement, subject to the terms
> and conditions established by the Master Plan or Plans with insurance carrier or
> carriers, a program of life insurance, accidental death and dismemberment insurance,
> accident and sickness insurance, hospital and surgical benefits, out-patient diagnostic
> X-ray laboratory benefits, X-ray and radioactive therapy benefits, emergency first-

---

[1]There were contracts before 1971. However, the Court is not concerned with them because no plaintiff
retired under the terms of any of those contracts.

aid benefits, and transition and bridge benefits, as set forth in this Agreement.

(Def's Ex. H, 1971 CBIA § 1.)

Also, each CBIA ends with a clause defining the length of the agreement. For example, the

1971 CBIA, states in Section 5:

> This Agreement shall be in full force and effect until midnight, [expiration date] and shall thereafter continue in effect from year to year unless a written notice of termination or modification is given by either party to the other sixty (60) days prior to the termination date.

(*Id*. at AG1 19.)

Finally, the body of each CBIA describes how the benefits stated in Section 1 apply to

various categories of beneficiaries.


**(2)  *Auburn Gear Contracts***

During the November 1982 purchase of the Auburn facility, the Defendant agreed to be

bound to all Borg-Warner's agreements with the Union, including the 1980 Borg-Warner CBA and

CBIA. In 1983, the Defendant and the Union negotiated a new CBA and CBIA. The new contract

had some substantial changes. Under one of those changes, the "30 and out" pension plan was

eliminated and replaced with a defined contribution plan.[2] However, to prevent a mass exodus of

employees who already qualified for "30 and out," the Defendant grandfathered them in by agreeing

to preserve their pre-1983 contract privileges for whenever they retire. Therefore, subsequent CBIAs

treated the grandfathered employees separately from all other employees and did not subject them

to the same increases in insurance deductibles and out of pocket expenses.

---

[2]"30 and out" provision allowed an employee to reap the benefits of retirement if his age and his number of years working for the company added up to 85. For example, a 55 year-old employee who has worked for the company for 30 years was eligible for retirement.

6

Despite the changes, the Defendant's CBAs continued to include integration and duration clauses similar to those in Borg-Warner. For example, the 1983 CBA stated that it was integrated with a concurrent CBIA and Insurance Agreement:

> 9.1.1   It is understood that this Agreement, together with the following Agreements, shall be considered the full working arrangement between the Company and the Union:
> (a) Retirement Income Agreement and Plan.
> (b) Insurance Agreement.
>
> 9.1.2   Each said Agreement shall be considered a separate portion which can be negotiated independently. Each of these several Agreements shall continue in full force and effect unless notice is given to modify, amend, suspend, or terminate as provided in each of the said Agreements.

(Def's Ex. A, 1983–86 CBA, § 9.1.1–9.1.2.)

Also, just as Borg-Warner's CBIAs, the 1983–2001 CBIAs limit the duration of various health benefits offered by the company. For example, the 1983 CBIA states in Section I:

> The Company will maintain during the period of this Agreement, subject to the terms and conditions established by the master plan or plans with insurance carrier or carriers, a program of life insurance, accidental death and dismemberment insurance, accident and sickness insurance, hospital and surgical benefits, out patient diagnostic X-ray and laboratory benefits, X-ray and radioactive therapy benefits, emergency first-aid benefits, transition and bridge benefits, prescription drug plan, dental plan, extended care benefits, vision care, and extended disability benefits as set forth in this Agreement.

(Def's Ex. A, 1983–1986 CBIA § I..)

All subsequent CBIAs begin with nearly identical language. However, starting in 1991, Section I was rewritten:

> The Company will provide during the term of this Agreement, a program of benefits including preferred care comprehensive major medical benefits, pharmaceutical drug benefits, vision care benefits, dental care benefits, accident and sickness benefits, extended disability benefits, accidental death and dismemberment benefits, death benefits, bridge and transition benefits, and retiree benefits, as set forth this Agreement.

7

(Def.'s Ex. D, 1991–1995 CBIA § I.) Section I stayed the same in the remaining agreements.

Finally, just as Borg-Warner's CBIAs, the 1983–2001 CBIAs end with a paragraph defining the length of the agreement. For example, the 1983 CBIA states:

> This Agreement shall be in full force and affect until midnight, [of the expiration date], and shall thereafter continue in effect from year to year unless a written notice of termination or modification of the Agreement is given by either party to the other sixty (60) days prior to the termination date.

(Def.'s Ex. A, 1983–1986 CBIA § IX.)

The 1985 and 1988 CBIAs end with the same duration clause. The 1991, 1995, and 1997 CBIAs also contain duration clauses but they are tied directly to the corresponding CBAs: "[t]his Agreement shall be in full force and effect for the duration of [the Contract between the Company and the Union]." (Def's Ex. D, 1991 CBIA, § 15.1.)

Finally, the body of the Defendant's CBIAs, like the ones under Borg-Warner, contained sections describing how health care benefits apply to various beneficiaries. Over the years, some terms kept changing, while others remained the same.

For example, the 1985 CBIA added a Preferred Care plan which encouraged retirees to obtain services from preferred health care providers. The 1988 CBIA added outpatient lab and x-ray as an identified benefit. In addition, current and future retiree's contributions changed to $8.50 per month. The prescription drug co-pays changed to $2 for generic and $8 for brand name drugs. The 1991-95 CBIA added a requirement that the grandfathered employees pay $8.50 per person per month for health insurance. Also, this CBIA began requiring preauthorization for certain medical procedures and increased the cost for both generic and brand name drugs to $6 and $12. The plan also placed an annual cap to the amount of how much drug costs the insurance would cover. The 1995 CBIA did not add any changes to the plan. The 1997 CBIA raised the premium amount for

8

grandfathered employees to $11.50 per month. This CBIA also increased the cost for brand name drugs to $15.

**(4) *Expiration of the Final CBA and CBIA***

The 1997 CBA and CBIA were the last contracts between the Defendant and the Union. They expired in April 2001. Nevertheless, the retirees' health benefits were extended for about a year through a series of letter agreements between the Union and the Defendant. In May 2002, the health benefits were extended by a six-month deferral agreement in which the Defendant and the Union agreed "to continue to operate as they have for the past 10 months until they either reach a new collective bargaining agreement or November 3, 2002, whichever comes first." (Def's Ex. O.)

On November 3, 2002, the six month deferral agreement expired as no new contract was reached, and the Defendant sent the retirees a notice that it was cancelling their health benefits.

**(5) *1983 Negotiations***

After the Defendant purchased the Auburn plant in 1982, it negotiated its first agreement with the Union in the spring of 1983. Curt Hoenie was the Defendant's scribe during the negotiations, responsible for taking the minutes. During the March 28, 1983, negotiation session, Hoenie wrote down the following statements attributed to Terry Dean, the Defendant's chief negotiator:

> Terry:  Clarified whether ERISA crossed over to cover Insurance benefits for current retirees.
> We have investigated and it appears it can be modified.
>
> We are of the opinion barring further legal opinion, it can be changed and our prior proposal on insurance which covered future retirees, it now applies to

all retirees.

(Pfs' Ex. 9, AG1 2883.)

> Terry:     When we entered into negotiations we had told you that retiree costs couldn't be changed, now we think it can be changed. We will be back in with a rearrangement, but we have to be competitive.

(*Id.* at 2887.)

Also, Hoenie wrote down a statement attributable to the Union's President, Sal Bevilacqua:

> Sal:     We aren't willing to take away from the retirees. They are on a fixed income. It is our legal opinion that we can't negotiate away retiree benefits.

(*Id.* at 2902.)


**(6) *Grandfathered Employees***

As explained above, when the Defendant purchased the Auburn facility, many employees eligible for "30 and out" provision under the Borg-Warner's contract were considering retirement before this provision was eliminated by the Defendant's new contract. In its attempt to stop employees from leaving, the Defendant agreed to grandfather the employees who were eligible to retire under "30 and out," so that they would be assured the same benefits as the employees who retired before the new contract was signed. Dean sent them the following letter:

> As you are aware, as part of the recent labor agreement, employees with more than thirty (30) years of service or a combination of years of service and age equaling or greater than 85 points were grandfathered for pension and insurance benefits at time of retirement.

> Therefore, upon retirement, you will receive the same pension and insurance benefits that you would have received had you retired on April 1, 1983. Your date of retirement, of course, completely your decision and this agreement will be in effect whenever you elect to retire.

(Pfs' Ex. 11.)

10

During his deposition, Dean explained his letter:

And what we said for those people who were eligible to retire, they could continue to work and we would maintain their benefits at the same level they had in the prior agreement. So for everyone else, those benefits terminated and a new plan was put in place. They were vested deferred. And so the people who had the 55, the 30 and 55 could still get the level of benefits they had before.

(Dean Dep. at 43.)

### (7) *1990 Arbitration*

In 1990, the Defendant and the Union arbitrated a dispute over a health care coverage for one retiree's new wife, who was significantly younger than he. The Defendant refused to cover her under its retirees' health insurance because it feared of "being stuck with paying for an uncontrollable amount of benefits over an uncontrollable amount of time." (Dean Dep. at 89.) During the arbitration Dean testified:

Well, what we had was a 30 and Out situation, and the retirees . . . were retiring after 30 years of service at any age. We had some people retiring as early, as I remember, as 49 years old, and consequently living from age 49 or 50, to in the seventies and we were covering them, for pensions for 20 years, plus . . . for insurance for that period and those costs were very high. We also had an issue, that existed at the time, with one specific employee, a gentleman by the name of Traster, who was 53 years old, and who prior to his retirement had, his wife had passed away and he had remarried, and married a young lady who was 24 years old, and by the Insurance Agreement that existed prior to the '83 negotiations, we would cover her, not only through his lifetime, but until she remarried as a surviving spouse, so it, with an escalating insurance costs we were extremely concerned about Jewel Traster, and the costs that she would incur if she lived to say, 65 or 70, and we in effect were taking a 23 or 24 year old person . . . and covering her for something like 40 years, at a cost that was uncontrollable by us and going up at 23, 24% a year.

(Pfs' Ex. 10 at 60–61.)

### (7) *The Named Plaintiffs*

All three named Plaintiffs believe that they are entitled to lifetime health insurance from the Defendant. While they were working at the Auburn Plant and since they have retired, they have always thought that the retirees' health insurance was for life. They are convinced that the CBIAs promise them that security.

## C. Analysis

### (1) *The Parties' Contentions*

The parties disagree whether, under the terms of the CBIAs, the health insurance vested to the Plaintiffs upon their retirement. If it did, it would "become forever unalterable," *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir. 2005), and the Defendant would be required to reinstate it. However, if the retirees' benefits were limited to the existence of each CBIA, they would be subject to negotiations between the Defendant and the Union.

The Plaintiffs argue that all CBIAs promised them permanent health insurance upon their retirement, and, as a consequence, the Defendant had no right to discontinue this benefit. They believe that the time limitation at the beginning of each CBIA ("The Company will maintain during the period of this Agreement [various benefits] as set forth in this Agreement") applies only to active, not retired, employees. In the alternative, they argue that the time limitation is ambiguous at best as to whether it applies to retiree benefits. According to the Plaintiffs, the CBIAs contain both patent and latent ambiguity. They believe that latent ambiguity becomes obvious once one considers the grandfathering of certain employees, the evidence from the 1983 bargaining negotiations, and Dean's testimony during the 1990 arbitration hearing. The Plaintiffs submit that the case must go to a jury, who will determine whether the parties intended the health care benefits to vest to the

12

retirees.

The Defendant contends that the CBIAs explicitly limit to the term of their existence the retirees' benefits and contain neither patent nor latent ambiguity that would require extrinsic evidence to interpret them. In the alternative, the Defendant argues that the extrinsic evidence is consistent with the language of the CBIAs that the health insurance did not vest to the retirees.

**(2)** *Discussion*

(a) *Rules of Construction*

The courts analyze collective bargaining agreements using the principles of contractual interpretation. "Under these rules, a document should be read as a whole with all its parts given effect, and related documents must be read together." *Bland*, 401 F.3d at 783. "The terms of a collective bargaining agreement are to be enforced strictly when the terms are unambiguous," *Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters 226*, F.3d 535, 546 (7th Cir. 2000), that is, they lend themselves "to only one reasonable interpretation," *Alexander v. City of Evansville*, 120 F.3d 723, 727 (7th Cir. 1997).

The Seventh Circuit has applied these principles to disputes between retirees and their former employers over changes in health care benefits. Furthermore, to reduce the courts' and the litigants' frustration about the uncertainty of retirees' health insurance status, the Seventh Circuit has provided four rules to determine the viability of retirees' claims that health benefits had vested to them:

> 1. If a collective bargaining agreement is completely silent on the duration of health benefits, the entitlement to them expires with the agreement, as a matter of law (that is, without going beyond the pleadings), unless the plaintiff can show by objective evidence that the agreement is latently ambiguous, that is, that anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says. This is the *Bidlack* presumption and its latent-ambiguity

13

rebuttal.

2. If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as "during the term of this agreement," then, once again, the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence. This is a general rule of contract law, independent of but consistent with *Bidlack*.

3. If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor. We are speaking of a case in which merely suggestive language creates a patent ambiguity.

4. If the plaintiff is entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting objective evidence of meaning.

*Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 547 (7th Cir. 2000).

The Court will apply these rules to all CBIAs.


(b) *1991–2001 CBIAs*

The Defendant submits that the 1991–2001 CBIAs state explicitly that the retirees were provided health insurance only for the term of those CBIAs, thus contradicting the Plaintiffs' claim that the benefits vested to them.

If this is right—if someone who read these provisions without knowing anything about their background or real-world context would say, "Yes, it sure looks as if the provisions are in effect only for the term of the agreement in which they appear"—then [the Defendant] is off the hook as a matter of law . . . unless [the Plaintiff] can adduce (1) objective evidence of (2) a latent, or, as it is sometimes called, an extrinsic, ambiguity.

*Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 542 (7th Cir. 2000).

In response, the Plaintiffs do not contend that the time limitation contains either patent or latent ambiguity. Rather, they insist that the Defendant has waived its argument regarding

14

1991–2001 CBIAs because it has not separately addressed them until its Reply.

The Plaintiffs' submission that the Defendant has waived its argument regarding 1991–2001 CBIAs is unconvincing. In its Reply, the Defendant was responding directly to the contentions raised in the Plaintiffs' Response to its motion for summary judgment. The Defendant did not present a new argument or new facts but only further clarified its position why the Plaintiffs should not prevail. Accordingly, the Court will not deem the Defendant as having waived its argument.

The Court agrees with the Defendant that 1991–2001 CBIAs explicitly limit retirees' benefits to the duration of each CBIA. For example, the 1991 CBIA states in Section I that "[t]he Company will provide during the term of this Agreement, a program of benefits including . . . retiree benefits, as set forth in this agreement. . . ." (Def's Ex. D, 1991–95 CBIA, § I, ¶ 1.1.) The term of the agreement is the same as the duration of the corresponding CBIA (*See* § XV) "and shall thereafter continue in effect from year to year unless a written notice of termination or modification of the Agreement is given by either party to the other sixty (60) days prior to the termination date." (Def's Ex. D, 1991–95 CBA, §X, ¶ 10.1.)

There is only one way to interpret these clauses: any reasonable person reading them would know that retirees' benefits were bound to expire with the CBIA. Reliance for benefits after the CBIAs expire has no bases in the agreements. Consequently, the 1991–2001 CBIAs fall within the second rule of *Rossetto,* and, since the Plaintiffs have not shown a latent ambiguity in these agreements, they lose as a matter of law as to the 1991–2001CBIAs. *See id* 217 F.3d at 547 ("If the agreement makes clear that the entitlement expires with the agreement . . . the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence.").

15

(b) *1971–1991 CBIAs*

The parties disagree whether Section 1 of the 1971–91 CBIAs limits the duration of retirees'

health care insurance to the existence of the particular CBIAs. The 1971 CBIA illustrates the

disputed language in all these agreements. Section 1 provides:

> The Company *will maintain during the period of this Agreement*, subject to the terms
> and conditions established by the Master Plan or Plans with insurance carrier or
> carriers, a program of life insurance, accidental death and dismemberment insurance,
> accident and sickness insurance, hospital and surgical benefits, out-patient diagnostic
> X-ray laboratory benefits, X-ray and radioactive therapy benefits, emergency
> first-aid benefits, and transition and bridge benefits, *as set forth in this Agreement*.

(Def's Ex. H, 1971–74 CBIA § 1 (emphasis added).)

Section 2 of the agreement lists the benefits "for all employees actively at work": life

insurance, accidental death or dismemberment, hospital room and board, hospital extra fees, surgical

benefits, in-hospital medical, out-patient diagnostic x-ray and laboratory, x-ray and radioactive

therapy, emergency first aid.

Section 3 lists the benefits for retired employees: hospital room and board, hospital extra

fees, surgical benefits, in-hospital medical. This section also states that "[l]ife insurance after

retirement will be continued without contribution by the employee but only while the Life Insurance

plan continues in effect and unchanged in this respect." (*Id*. § 3.3.)

The Plaintiffs claim that time limitation in Section 1 applies only to active employees

because "each of the benefits listed in Section 1 is a benefit provided to active employees pursuant

to Section 2. Section 1 and Section 2 list the same benefits, all of which were provided to active

employees." (Pfs' Resp. at 22.) The Plaintiffs further argue their position by stressing that many of

benefits enumerated in Section 1 were not provided to retirees. For example, the retirees were not

eligible for accidental death or dismemberment insurance, accident and sickness insurance,

outpatient diagnostic x-ray and laboratory benefits, x-ray and radio-active therapy benefits, and so on, which were available to active employees. In addition, the Plaintiffs point out that, where the retirees' and active employees' benefits overlapped, the coverage levels of the benefits were different. According to the Plaintiffs, this shows that the company maintained more than one benefit program, whereas Section 1 speaks only of "a program." Thus, the Plaintiffs believe that ambiguity, both latent and patent, exists as to whether Section 1 applies to the retiree benefits section. They submit that the Court should consider extrinsic evidence to resolve the parties' dispute.

The Plaintiffs also analyze the 1974 and subsequent CBIAs and conclude that new additions to the retirees' section further bolster their position that the CBIAs are ambiguous. They focus on the following language in the 1980 CBIA:

- Employees who have retired prior to April 25, 1980 will have the following hospital and surgical benefits. . . . To be eligible for the continuation of these coverages the retiring employee must have at least ten years' credited service at the time of retirement (Def's Ex. N, 1980–1983 CBIA, § 6, ¶1.);

- Employees who have retired on or after April 25, 1980, will be allowed to continue the hospital and surgical benefits (hospital room and board, hospital extra fees, surgical benefits and in-hospital medical) in effect at the time of retirement. To be eligible for the continuation of these coverages, the retiring employee must have at least ten years' credited service at the time of retirement (*Id*. § 6, ¶2.);

- [sic] Continue to the surviving spouse (at time of retirement) of retirees, the following insurance coverages for spouses and eligible dependents. Such continuation will cease upon the death of the spouse or upon remarriage. . . . No other coverages will be continued (*id*. § 6, ¶3.);

- Life insurance after retirement will be continued without contributions by the employee but only while the Life Insurance Plan continues in effect and unchanged in this respect (Def's Ex. N, 1980–1983 CBIA, § 6, 4(a).);

- Any employee who has retired under the Company's pension plan or who retires under the Company's pension plan will be eligible for the prescription drug plan, subject to $3 deductible for each order on the basis of updated quantities" (*id*. § 6, ¶6.).

17

The Plaintiffs submit that these paragraphs, "[b]y tying the right to continued health insurance to ten years of 'credited' service, [] duplicate[] the vesting formula of the pension agreement, thus treating the right to retiree insurance the same as the right to a pension which, of course, is indisputably vested for the lives of the retirees." (Pfs' Resp. at 30.) Also, they suggest that paragraph 3 explicitly states that the benefits for a retiree's spouse terminate only at the time of that retiree's death or the spouse's remarriage.

The Plaintiffs also note that the parties' continuing separate classification of grandfathered employees shows their intent to immunize them from the prospective changes in retiree benefits that were made for active employees who were not yet eligible to retire, thus revealing their intent to vest the health care insurance upon retirees.

Finally, the Plaintiffs insist that the extrinsic evidence, such as the letter to grandfathered employees, 1983 negotiations, and 1990 arbitration, reveals latent ambiguity as to whether the health insurance vested upon the Plaintiffs when they retired.

The Defendant disagrees with the Plaintiffs assertion that the 1971–1991 CBIAs are ambiguous as to the duration of the benefits. The Defendant insists that the language is clear on its face and remains such even when extrinsic evidence is introduced.

The language in 1971–1991 CBIAs concerning the duration of retirees' benefits contains no patent ambiguity. In all these agreements, the introductory section, Section 1, states that "the Company will maintain during the period of this Agreement . . . a program of life insurance, accidental death and dismemberment insurance, accident and sickness insurance, hospital and surgical benefits, out-patient diagnostic X-ray laboratory benefits, X-ray and radioactive therapy benefits, emergency first-aid benefits, and transition and bridge benefits, as set forth in this

18

Agreement." (Def's Ex. H, 1971–1974 CBIA, § 1.) The active employees section sets forth how and which of these benefits will apply to active employees. The retirees section also sets forth how and which of these benefits will apply to retirees.[3] The following table visually demonstrates the duration of retirees' benefits:

| Benefits Limited for the Duration of the CBIA (Section 1) | Are Active Employees Covered? (Section 2) | Are Retirees Covered? (Section 3) |
|---|---|---|
| Life Insurance | Yes | Yes |
| Accidental Death and Dismemberment Insurance | Yes | No |
| Accident and Sickness Insurance | Yes | No |
| Hospital and Surgical Benefits | Yes | Yes |
| Out-patient Diagnostic X-ray Laboratory Benefits | Yes | No |
| X-ray and Radioactive Therapy Benefits | Yes | No |
| Emergency First-aid Benefits | Yes | No |

Because the benefits in the active employees section and the retirees section are explicitly listed in Section 1, they are limited to the life of the CBIA, as stated in that section. Section 1 controls all sections, including the one dealing with retirees. Section 1 is the window through which a retiree must look to learn the duration of his or her eligibility for health insurance benefits. *See Corrao*, 161 F.3d 434, 441 (7th Cir. 1998) (finding that particular descriptions of benefits were controlled by the contract's introductory phrase "for the term of this Agreement").

Therefore, since Section 1 states that the hospital and surgical benefits are limited to the term of the CBIA, retirees' eligibility for these benefits expires with the CBIA. The same is true of

---

[3]As the Plaintiffs pointed out, the retirees' benefits were not as comprehensive as those of active employees.

19

benefits for their spouses (and dependents): a promise of health insurance for a spouse of a retiree until the retirees' death or remarriage is nevertheless controlled by Section 1's time limitation. Section 1 also governs the benefits for grandfathered employees. Thus, although their benefits are superior to other employees' benefits, they exist only so long as the particular CBIA exists. Once the CBIA expires, "life insurance, accidental death and dismemberment insurance, accident and sickness insurance, hospital and surgical benefits, out-patient diagnostic X-ray laboratory benefits, X-ray and radioactive therapy benefits, emergency first-aid benefits, and transition and bridge benefits" also expire no matter who the beneficiaries—active employees or retirees—may be. *Cf. Vallone v. CNA Financial Corp.*, 375 F.3d 623 (7th Cir. 2004) ("We have held that, when 'lifetime' benefits are granted by the same contract that reserves the right to change or terminate benefits, the 'lifetime' benefits are not vested.")

Again, then, the Plaintiffs may avoid summary judgment only if they can show that the agreements contain latent ambiguity. According to them, such ambiguity is revealed by the Defendant's letter to the grandfathered employees, the 1983 negotiations, and the 1990 arbitration.

"A latent ambiguity is an ambiguity (that is, something that makes it possible to interpret a document reasonably in more than one way), that is recognized as such only when a contract clear on its face—clear, that is, to the uninformed reader—is applied to a particular dispute." *Rossetto*, 217 F.3d at 542 (citations omitted). As noted above, the latent ambiguity must be revealed through objective evidence. *Supra* at 14. "That is, it must be evidence from which an inference about the parties' intentions in making the contract can be drawn with considerably greater confidence than if the parties were merely testifying to their private understandings of what the contract meant but failed to say." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 614 (7th Cir. 1998). Trade usage

can be such evidence. *See id.* "But it is not enough that a party has some objective evidence to offer on the meaning of the contract. The evidence must create a sufficient doubt about what the contract means to warrant submitting that meaning to determination by a trial, notwithstanding the apparent clarity of the written word." *Id.* at 614–15.

The Plaintiffs argue that "[t]he promise to the 'grandfathered' employees that whenever they retired they would receive the pension and retiree insurance benefits to which they were eligible on April 1, 1983, gives rise to the inference that these benefits did not expire at the end of the 1980 CBIA or any subsequent CBIA." (Pfs' Surreply at 11.) The Court sees no such inference. The Plaintiffs are not using the letter to the grandfathered employees to demonstrate that the time limitation for the benefits in the CBIAs means something other than this phrase's ordinary meaning is. Rather, the Plaintiffs present the letter for the purpose of interpreting the CBIAs, as intending lifetime health insurance for the retirees. The Plaintiffs do not present this evidence to show that the language in Section 1, "during the term of this agreement," had a specialized meaning which only a person who knew about the letter to the grandfathered employees would understand. *Cf. Corrao*, 161 F.3d at 441 (the plaintiff did not clearly and succinctly tell the court what the specialized meaning of "for the term of this Agreement" was in light of the proffered extrinsic evidence). Accordingly, the Plaintiffs have not demonstrated any ambiguity through this evidence.

Similar flaws exist with the evidence from the 1983 negotiations and the 1990 arbitration proceedings. The Plaintiffs argue that Hoenie's minute entries show that, at least in March 1983, the parties believed that the retirees' health insurance could not be reduced or terminated. Whether this inference is justified or not, it does not create ambiguity in the time limitation for the retirees' health benefits. At most, Hoenie's notes suggest that at some time before the negotiations, the Defendant's

21

negotiators believed that they could not change the retiree benefits. However, that evidence is subjective and itself calls for interpretation of what it means; it is far removed from the type of objective evidence the Seventh Circuit has looked for to find that a contract was ambiguous. *See Rossetto*, 217 F.3d at 543 (likening appropriate extrinsic evidence to the two *Peerless* ships [*Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)], which the parties believed to be one). The reader of the minutes must speculate about the notes and guess the negotiations' background. The evidence is not objective and it does not create latent ambiguity as to the explicit time limit of retirees' benefits.

The same is true with the evidence from the 1990 arbitration. This evidence only tells the Court that the Defendant was concerned that it would have to cover a retiree's new wife, a young woman, for her lifetime, when the costs of health insurance were uncontrollably increasing by as much as 24% a year. The Defendant's concern does not at all mean that CBIAs conferred lifetime benefits upon the retirees. Its concern about the costs was equally valid without the benefits being vested so long as it provided health insurance for its retirees. Most important, however, the Defendant's concern reveals no other meaning of Section 1 of the CBIAs. As a result, extrinsic evidence is not needed to interpret the contracts.

In addition, the necessity to interpret the CBIAs within their four corners is underscored by the parties' inclusion of integration clause in their contracts. The Court is bound to honor the parties' wishes that only the written agreements "shall be considered the full working arrangement between the Company and the Union." (Def's Ex. G, AG1 2406.) In the end, "written agreements exist precisely because subjective understandings can vary so much from individual to individual." *Rossetto*, 217 F.3d at 543.

Finally, the Plaintiffs argue that the addition of the words "retiree benefits" to Section I in 1991–95 CBIA shows that, in the previous CBIAs, the parties intended the retirees' benefits to be for their lifetime. For this proposition, the Plaintiffs rely on *Rossetto*, 217 F.3d 539, where the court of appeals found that the Plaintiffs rebutted the *Bidlack* presumption against vesting of the benefits by showing that the agreement contained latent ambiguity. But the Plaintiffs' argument is implausable and their reliance on *Rossetto* is misplaced.

*Rossetto*'s facts are different from the case at hand. There, two unions—the forty-five-member machinists' union, to which the plaintiffs belonged, and the seven hundred-member brewery workers' union— had almost identical contract with the same employer. The one difference was that the employer negotiated with the brewery workers' union an amendment in the bargaining agreement to limit health and welfare benefits for the "term of this agreement," while it did not rally for such provision in the contract with the plaintiffs' union. *See id*. The contract of the plaintiffs' union was silent on the duration of the health care benefits. From this difference, the court of appeals concluded that, for economic reasons, the employer might have intended to limit the duration of health care benefits for its seven hundred-member union for economic reasons, while it was not concerned to do the same for the plaintiffs' forty-five member union. Thus the court found latent ambiguity as to what the silence about the duration of benefits in the plaintiffs' contract meant. Moreover, the court noted that the ambiguity was underscored by the fact that a different employer, Schlitz Brewing Company, which had an identical contract with another branch of the machinists' union, continued to provide health insurance to the retired machinists of one of its facilities that closed many years ago.

Nothing similar has happened in the case at hand. The Court is not aware of any other unions

in this case and all the CBIAs have time limitation on the benefits—"during the term of this Agreement"; they are not silent. Moreover, the addition of words "retiree benefits" in the 1991–2001 CBIAs did not constitute either an explicit or implicit change in the duration of retirees' benefits, because, as explained above, the retirees' benefits, even before 1991, were limited to the existence of the CBIAs. If anything, the addition further underscored that which already was clear: that the retiree health care benefits expired with each CBIA. The addition of "retiree benefits" does not create latent ambiguity in 1971–1991 CBIAs.

The CBIAs before this Court are similar to the one in *Corrao*, where the court of appeals found that the parties' inclusion of the phrase "for the term of this Agreement" in the contract was "very close to what the *Bidlack* court found lacking in the agreement before it." *Corrao*, 161 F.3d at 441. *Bidlack* warned that "[e]mployers adamant against assuming perpetual obligations can eliminate all doubt by insisting on a clause that makes any entitlement to health benefits granted by the agreement expire on the date the agreement expires." *Bidlack v. Wheelabrator*, 993 F.2d 603, 609 (7th Cir. 1993). The Defendant did just that, and it must prevail against the Plaintiffs' claims that the 1971–1991 CBIAs entitled them to lifetime health insurance coverage. Like the 1991–2001 CBIAs, the 1971–1991 CBIAs fall within *Rossetto*'s second rule that makes the Plaintiffs lose as a matter of law.

**CONCLUSION**

Since 1971, the CBIAs have consistently stated that, during the term of their existence, the Defendant will provide certain health insurance benefits to its retirees. When the last agreement expired in 2001, so did the retirees' entitlement to the Defendant's health insurance. Undoubtably,

many Plaintiffs, who over the years have relied on these benefits for their health care, have found themselves in difficult situations. Although aware of these hardships, the Court must enforce the agreements as written. Accordingly, the Court GRANTS the Defendant's motion for summary judgment [DE 53] in its entirety.

SO ORDERED on August 9, 2005.


    S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT